JACKSON B. BRAGG AND SUZANNE BRAGG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bragg v. Commissioner
Docket No. 18827-90
United States Tax Court
T.C. Memo 1993-479; 1993 Tax Ct. Memo LEXIS 486; 66 T.C.M. (CCH) 1047; October 18, 1993, Filed *486 Decision will be entered under Rule 155. For petitioners: B. Gray Gibbs. For respondent: Charles A. Baer. WRIGHT
WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: For taxable year 1985, respondent determined a $ 75,848 deficiency in petitioners' Federal income tax, an addition to tax for fraud under section 6653(b)(1) [1] in the amount $ 37,924, an addition to tax under section 6653(b)(2) for 50 percent of the interest due on $ 75,848, an addition to tax for a valuation overstatement under section 6659 in the amount of $ 16,176, and an addition to tax for a substantial understatement of income tax under section 6661 in the amount of $ 5,482. After concessions by both parties, which will be given effect in the Rule 155 computation, the issues for decision for taxable year 1985 are: (1) Whether petitioners *487 are entitled to a claimed charitable contribution deduction under section 170 in the amount of $ 145,000 for the donation of a yacht hull to a charitable organization. We hold that they are not, but that a deduction of $ 45,000 is allowable. (2) Whether petitioners are entitled to deduct rental expenses with respect to alleged rental property which they own in North Carolina. We hold that they are not. (3) Whether petitioners are entitled to a bad debt deduction for sums paid to or on behalf of their son Charles Bragg. We hold that they are not. (4) Whether petitioners are liable for the additions to tax under section 6653(b) for fraud. We hold that they are not. (5) Whether petitioners are liable for the addition to tax for a valuation overstatement under section 6659. We hold that they are. (6) Whether petitioners are liable for the addition to tax under section 6661 for a substantial understatement. We hold that they are. (7) Whether petitioners are liable for interest on a substantial underpayment attributable to tax-motivated transactions under section 6621(c). We hold that they are. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. *488 The stipulation of facts and attached exhibits are incorporated by this reference. Petitioners resided in Daytona Beach, Florida, at the time they filed the petition in this case. Petitioners are married and filed a joint Federal income tax return for taxable year 1985. References to petitioner in the singular refer to Jackson B. Bragg. Yacht
In 1969, petitioners began construction of an ocean-going aluminum yacht. A naval architect drew the original plans, which called for an 83-foot yacht. During construction, the size of the yacht was modified by adding 10 feet to the midsection. In 1971, petitioners ceased construction of the yacht and never recommenced construction. At the time construction ceased, the hull was approximately 70 percent finished. Specifically, aluminum plating had been installed, and fuel, water, and sewer tanks had been installed as well as hot and cold water pipes and bathroom plumbing. The vessel had no engine, hull plates, or cabin. Petitioners constructed and stored the hull in a warehouse owned at various times by petitioner or his son Charles Bragg. One end of the warehouse was cut open in order to make room for the additional 10 feet *489 of construction leaving the hull partially exposed to the outdoors. During the period from 1972 through 1985, petitioner attempted to sell the hull. In 1973, Mr. Robert Sherbert, a master builder and designer of boats for 32 years, inspected the plans and the hull. Mr. Sherbert was considering purchasing petitioners' hull to use in the construction of a yacht for a client. Mr. Sherbert's client inquired as to the value of the hull; Mr. Sherbert stated that petitioners would ask $ 145,000 to $ 150,000. Mr. Sherbert's client did not purchase the hull. Mr. Sherbert was one of petitioners' expert witnesses at trial. In 1985, petitioner authorized Bill Begley, a yacht broker employed by Adventure Yacht Sales, Inc. (Adventure), to sell the hull for a commission of 10 percent. Petitioner came to Adventure to purchase another boat as well as to sell the hull. Mr. Begley presented the hull to several potential buyers. Mr. Begley was unable to recall the names of all the potential buyers; however, he had dealings with one gentleman from Director's Boat Yard, Hank Hostrup from Palatka Ship Builders, and one or two other persons with respect to the selling of the hull. From his dealings *490 with the potential buyers, Mr. Begley was told that moving the hull would create an additional expense. In order to move the hull to a navigable area, the warehouse would have to be dismantled, power lines and trees would have to be removed, and permits would have to be obtained. Adventure obtained two independent appraisals of the hull; petitioners paid for both appraisals. The first appraisal was performed on August 7, 1985, at a cost of $ 80 by marine surveyor Mr. Robert Marks, Jr., who estimated the current market value of the hull to be between $ 30,000 and $ 35,000 and its scrap value to be $ 8,400. The second appraisal was performed on August 8, 1985, at a cost of $ 75 by marine surveyor Mr. Charles Swimm who estimated the current market value of the hull to be $ 28,744 and its scrap value to be $ 7,714. Mr. Swimm did not inspect the plans for the yacht; however, he did inspect the hull. Mr. Hank Hostrup, a marine consultant, surveyor, and estimator, was contacted by Mr. Begley with respect to purchasing the hull for a client. Mr. Hostrup inspected the hull, determining that it was 70 to 75 percent completed. Mr. Hostrup did not review the plans for the yacht. Mr. *491 Begley recommended that Mr. Hostrup offer $ 50,000 for the hull. Mr. Hostrup recommended to his client that the hull not be purchased for $ 50,000 because Mr. Hostrup was told by Mr. Begley that nondestructive testing was performed on the welds indicating that 75 percent of the welds were defective. Mr. Hostrup made an offer of $ 45,000 for the hull, which offer was rejected by petitioner. After spending what Mr. Begley claimed to be a considerable amount of time trying to obtain a buyer for the hull without procuring a sale, Mr. Begley suggested other options to petitioner including selling the hull for scrap and donating the hull. Adventure informed petitioner that if he wanted more money for the hull, he should donate it to a tax-exempt institution. Mr. Begley was notified that petitioner intended to donate the hull. Petitioner sought the advice of his accountant, Mr. Larry Stockhausen, with respect to the donation of the hull to a charitable organization. Mr. Stockhausen is a certified public accountant (C.P.A.) and has been petitioners' tax return preparer since 1976. Mr. Stockhausen advised petitioner to obtain a qualified appraisal of the hull and to seek the advice *492 of a tax attorney. Petitioner contacted Mr. Marshall Barkin, a tax attorney, with respect to the donation. Subsequently, Mr. Barkin sent petitioner an opinion letter merely setting forth the rules relating to charitable contributions. Petitioner engaged the services of Mr. Stanley Solomon, a real estate attorney, to assist in the donation of the hull. Petitioner contacted several potential donees for the hull including the Florida Institute of Technology, Florida Southern College, a YMCA, and the Unity Center of Christ of Daytona Beach, Florida (sometimes referred to as the church). Petitioner chose to donate the hull and the warehouse in which it was housed to the Unity Center of Christ. During the taxable year at issue, the Unity Center of Christ, Daytona Beach, Florida, was a qualifying organization under section 170(c). Petitioner obtained the services of Captain William Weber to survey and appraise the hull. Petitioner explained to Captain Weber that the purpose of the appraisal was to effectuate a donation of the hull to a church. Captain Weber has been in the business of shipbuilding and surveying marine vessels for nearly 50 years. Captain Weber was one of petitioners' *493 expert witnesses at trial. On December 14, 1985, Captain Weber certified that he conducted an appraisal of the hull to determine its condition and to establish its current market value. In his 1-1/2-page appraisal report, Captain Weber outlined in four paragraphs the work completed on the hull, and in the following three paragraphs, made observations as to what was still to be completed based upon the original plans for the yacht. In the fifth paragraph, Captain Weber concluded that the vessel was in one-third of its completed stage of construction, and in considering the quality of materials used and quality of workmanship, determined the fair market value of the vessel to be $ 145,000. In the final paragraph, Captain Weber stated that his appraisal was based upon the facts presented and evidence of expenditures involving materials and labor. Petitioner paid Captain Weber $ 580 for his appraisal. Mr. Solomon drafted the donation agreement dated December 5, 1985, in which it was agreed that the acceptance of the hull by the church was contingent upon the concurrent donation of the warehouse and that the church hold title to such property for a period of 2 years. The agreement *494 was signed by petitioner; Reverend John Byrns signed on behalf of the church. At some time subsequent to this initial agreement, Reverend Byrns decided that the church did not want the warehouse as it was encumbered by a first mortgage. Before the end of 1985, Reverend Byrns told petitioner that the church did not want the real property. The original December 5, 1985, agreement was later modified by crossing out all references to the warehouse to reflect that the real estate was not part of the donation transaction; the document reflects that it was initialed by both parties. There is no date indicated on the document with respect to when it was initialed to reflect the change. Reverend Byrns initialed the modification of the original agreement on May 13, 1987. Ms. Kay Beardsley, the tax auditor dealing with petitioners' 1985 taxable year, was given an affidavit by petitioner which stated that petitioner modified, signed, and initialed the document in December 1985. The church made several attempts to sell the hull which were unsuccessful. On February 23, 1988, petitioner informed the church that the hull had to be removed from the warehouse; the church sold the hull for scrap, *495 netting $ 6,000. Respondent's expert witness, Mr. Fred Struben, a marine appraiser and surveyor, performed an appraisal on the hull on October 7, 1987. Mr. Struben determined that the realistic value of the hull was its scrap value. Mr. Struben did not personally inspect the hull nor did he inspect the original plans; he relied on photos taken of the hull and Captain Weber's appraisal report. Mr. Struben stated in his report that as unfinished, it would be highly unlikely that a buyer would purchase the hull for purposes of completion. He based this statement on the fact that the market for large yachts had been seriously depressed for many years, and a prudent buyer would not incur the great expense necessary for completion. Mr. Struben did not offer a determination as to the fair market value of the hull beyond its possible scrap value. On petitioners' return for taxable year 1985, petitioners claimed a $ 145,000 charitable contribution deduction for the donation of the hull to the Unity Center of Christ. Respondent disallowed the deduction and determined that the correct value of the donated hull was zero. North Carolina Property
In 1981, petitioners purchased a *496 parcel of unimproved real property on Ski Mountain, Bowling Rock, North Carolina. Petitioners began construction of a three-story fieldstone home on the property in 1983 and completed construction in November 1984. In December 1984, Mrs. Bragg's sister and brother-in-law, Mr. and Mrs. Robert Rickard, stayed at the North Carolina property. It is alleged that Mr. Rickard paid petitioners $ 2,000 for this use. Petitioners and Charles Bragg also used the North Carolina property in December 1985 in an effort to escape the media coverage of Charles Bragg's criminal trial. From January to June 1985, the property was closed, and on July 10, 1985, petitioner was notified it had suffered extensive water damage. Mrs. Bragg went to North Carolina on July 17, 1985, to oversee repairs to the property and remained until the latter part of August. Petitioners did not rent the property in 1985. On May 14, 1987, Mr. Rickard had a letter sent to petitioner per petitioner's request stating that his company, R & R Direct Mail, had rented the North Carolina property for a period of time during 1984, and that it was intended the property be rented during 1985 for the use of Mr. Rickard's clients; *497 however, due to circumstances beyond Mr. Rickard's control, neither he nor his company was able to rent the property in 1985. Mr. Rickard testified that due to business setbacks and family illness, he could not rent the property for his clients or himself. Petitioners did not attempt to rent the property with the exception of their alleged attempt to rent to Mr. Rickard in 1985. On their return for 1985, petitioners claimed a rental loss in the amount of $ 41,463 with respect to their North Carolina property. Respondent disallowed the rental loss, claiming that petitioners did not hold the property out for rental purposes during 1985. Payments to or on Behalf of Charles Bragg
On December 4, 1984, petitioners' son, Charles Bragg, was arrested and charged with racketeering and conspiracy to traffic in marijuana. On April 13, 1985, Charles was found guilty of these charges. During 1985, petitioners paid expenses and legal fees for their son in the amount of $ 108,191.24. Petitioners claim that they became aware that their son could not repay them the amounts advanced as of November 1985. Petitioners made additional payments of $ 242,566 for their son's legal fees and *498 expenses in 1986, 1987, and 1988. On April 18, 1985, petitioners made payment of $ 40,768.77 to Atlantic Bank to pay off a first mortgage owed by Charles Bragg on real property which Charles Bragg deeded to petitioners on March 29, 1985. Petitioner was a cosigner on that mortgage. In May and June 1985, petitioners paid off a $ 36,626.84 second mortgage owed by Charles Bragg and Charles Bragg's wife on real property which Charles Bragg deeded to petitioner. Petitioner was a cosigner on that second mortgage. Charles Bragg received the loan proceeds from the second mortgage. After Charles Bragg deeded the property subject to the second mortgage over to petitioner, petitioner borrowed $ 76,000 to pay off the above-mentioned mortgages to Atlantic Bank. In addition to the properties identified above, Charles Bragg transferred a third property to petitioners; Charles Bragg had a one-third ownership interest in this property. On their 1985 return, petitioners claimed short-term capital losses as follows: Date
Date
Sales
Description
Acquired
Sold
Price
Cost
Loss
Gain
Atlantic Bank
1/3/85
4/17/85
0
$ 40,769
$ 40,769
0
Atlantic Bank
1/31/85
6/28/85
0
$ 36,627
$ 36,627
0
*499 There was no written agreement evidencing any debt owed by Charles Bragg to petitioners. The 1985 return did not identify the deductions as bad debts. Mr. Stockhausen, petitioners' tax return preparer, claims that petitioners were not involved with placing "Atlantic Bank" on the return as describing the short-term capital loss; a staff accountant is alleged to have been responsible. Mr. Stockhausen admits that the dates chosen by him for the "Dates Acquired" and "Dates Sold" columns indicated on the return were arbitrary. Mr. Stockhausen further claims that his firm, as a matter of practice, arbitrarily selects dates for "Date Acquired" and "Date Sold" on returns, which numbers are picked out of the air with no relation to reality. The term "Bad Debt" is nowhere mentioned on petitioners' 1985 return. Petitioners' previous claim of a bad debt deduction for a guarantee on a loan to a relative on their 1984 return had been disallowed by a report issued in April 1986. The report was mailed to petitioners. Petitioners filed their 1985 return on August 20, 1986. Petitioners described the deduction on their 1984 return as "bad debt". OPINION Issue 1: Entitlement to a Charitable *500 Contribution
Valid Transfer
Based upon two alternative arguments, respondent contends that petitioners are not allowed a charitable contribution deduction in 1985. First, respondent argues that the gift of the hull was not effective in 1985 because delivery did not occur in 1985. Second, respondent argues that petitioners are not entitled to a charitable contribution deduction for 1985 because the value of the donated property was zero. In determining whether petitioners are entitled to their claimed charitable contribution deduction for the tax year at issue, we must determine whether petitioners made a valid contribution. Section 170(a) permits a deduction for a contribution or gift to any entity described in section 170(c) that is paid within the taxable year. Deductions are strictly a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deductions claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S.    , 112 S. Ct. 1039, 1043 (1992). In determining the existence and timing of a charitable contribution, the analysis applied is the same analysis applied in determining the existence *501 and timing of an inter vivos gift. DeJong v. Commissioner, 36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962). This Court has consistently held that one of the essential elements of a charitable contribution is delivery by the donor to the donee of the subject matter of the gift or of the most effectual means of commanding dominion over it. Whitt v. Commissioner, 751 F.2d 1548, 1561 (11th Cir. 1985), affg. T.C. Memo. 1983-262; Guest v. Commissioner, 77 T.C. 9, 15-16 (1981). The regulations do not define delivery. In order to determine whether delivery was effectuated, we look to State law. Greer v. Commissioner, 70 T.C. 294, 304 (1978), affd. 634 F.2d 1044 (6th Cir. 1980). The transfer in the instant case took place in Florida, so we will look to the relevant law in that jurisdiction. Under Florida law, the essential elements of a valid gift include: (1) Donative intent by the donor; (2) effective transfer and delivery; (3) actual and implied acceptance by the donee; *502 and (4) clear and satisfactory evidence of every element. United States v. Viomar Co., 616 F. Supp. 24, 26 (S.D. Fla. 1985). Respondent contends that the delivery requirement enunciated in United States v. Viomar Co., supra, has not been met in the instant case; therefore, the gift of the hull was not effectuated in 1985. In support of this contention, respondent points to the transfer agreement dated December 5, 1985, between petitioner and Reverend Byrns. That agreement provided, in part, the following: It is further understood that acceptance of the donation of the boat is contingent on the concurrent donation of the above mentioned building and lot, as the boat is at present housed in the building and is at the moment an integral part of the building. * * *
Respondent argues that the agreement illustrates that acceptance of the hull was contingent upon acceptance of the warehouse and acceptance of the warehouse never took place; therefore, the delivery requirement was not met in 1985. Petitioners point to the bill of sale document dated December 15, 1985, as evidence that the gift was effectuated *503 in 1985. The bill of sale, notarized by Attorney Stan Solomon and signed by petitioner, makes reference to the transfer of the hull only; there is no mention of the warehouse in the document. Mr. Solomon testified that he was certain the bill of sale was executed and notarized by him on December 15, 1985. Reverend Byrns testified that the church accepted the hull in 1985. Although the December 5, 1985, agreement calls for the concurrent donation of both the hull and the warehouse, we find that the bill of sale document dated December 15, 1985, signed by both parties, was intended by both parties as a modification of the original agreement of December 5, 1985, as the documents and Reverend Byrns' testimony indicate. Further, we find that the delivery requirement has been met in this case; therefore, petitioners made a valid charitable contribution in 1985. Valuation of the Hull
Having found that petitioners made a valid charitable contribution of the hull in 1985, we must determine the amount of the contribution. Respondent argues in the alternative that petitioners are not entitled to a charitable contribution deduction in 1985 because respondent contends that the fair *504 market value of the donated property is zero; petitioners contend the value to be $ 145,000. A charitable contribution deduction is limited to the fair market value of the property donated as of the date of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. The fair market value of donated property other than money is the price at which the property would change hands between a willing buyer and willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs. The fair market value of property which is the subject of a charitable contribution is an issue of fact to be resolved from consideration of all the relevant evidence of record in the case. Skripak v. Commissioner, 84 T.C. 285, 320 (1985); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). While we must consider the entire record, we have broad discretion to decide which facts are most important in reaching our conclusion because "finding market value is, after all, something for judgment, experience, *505 and reason". Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court dated Jan. 22, 1951. The burden is on the taxpayer to prove that the value determined by respondent is incorrect. Rule 142(a). In the instant case, both petitioners and respondent rely on expert opinion to support their respective positions regarding the fair market value of the donated property. We evaluate expert opinions in light of the demonstrated qualification of the expert and all other evidence of value. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Parker v. Commissioner, 86 T.C. 547, 561 (1986). As the trier of fact, we are not bound by an expert's opinion where it is contrary to our judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139; IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991). *506 We will consider expert opinion to the extent that it assists us in resolving the issues presented by the instant case. IT&S of Iowa, Inc. v. Commissioner, supra at 508. At the outset we note that questions of fair market value are more properly resolved through settlement negotiation rather than litigation. In the absence of such a settlement in the instant case, we are left to adjudicate the validity of conflicting experts' opinions. Petitioners offered the expert testimony of Captain William Weber; we do not question the expertise of this witness. Captain Weber provided petitioners with the 1-1/2-page appraisal report attached to their return for 1985. Captain Weber's expert witness report consists of a 1-1/2-page document stating the factors relied upon in determining the initial appraisal, as well as his resume, copies of receipts submitted by petitioners, plans for the yacht, and a copy of his initial appraisal report. In his expert witness report, Captain Weber stated that he determined the market value of the hull by considering his physical inspection of the hull and its plans, the qualifications of the personnel who worked on the *507 hull, the high quality of the materials used, the hull's state of completion, and receipts submitted to him for materials and labor. Petitioners also offered the expert testimony of master builder, Mr. Robert Sherbert; we do not question the qualifications of this witness. Mr. Sherbert, who represented a potential buyer of the hull in 1973, testified that his client turned down an offer of between $ 145,000 and $ 150,000 to sell the hull. In Mr. Sherbert's brief expert report, he concludes that based upon the quality of workmanship, materials, and design of the yacht, the fair market value of the hull in 1985 was in excess of $ 150,000. At trial, Mr. Sherbert testified that the hull was worth more than $ 145,000 in 1973 and presumably was worth 2-1/2 to 3 times that amount in 1985. Mr. Sherbert further testified that in his business he calculates estimates and costs. When asked about the market for hulls from 1979 to 1981, however, Mr. Sherbert stated that he was a designer and master builder, not a broker, and therefore he could not give a correct answer to that question. Respondent offered the testimony of one expert, Mr. Fred Struben; we do not question the expertise of *508 respondent's witness. Mr. Struben, however, did not personally inspect the hull or its plans. Mr. Struben took into consideration Captain Weber's appraisal, photos of the hull, and a pencil sketch of the hull in arriving at its value. Mr. Struben's expert report indicates that Captain Weber's report is unacceptable for use in establishing the fair market value of the hull. Mr. Struben criticizes Captain Weber's appraisal document on the grounds that it lacks important details and that Captain Weber's approach to valuation is erroneous. Mr. Struben contends that Captain Weber's report, being only 1-1/2 pages in length, falls short of being complete and is therefore unreliable. Mr. Struben further contends that it was inappropriate to take into consideration the cost of labor or materials used in determining fair market value. Mr. Struben insists that fair market value is the highest price in terms of money the property will bring if exposed for sale in the open market. Mr. Struben further stated in his report that it is highly unlikely that a buyer could have been found because the market for large yachts had been seriously depressed for years and that a potential buyer would *509 not have been willing to incur the expense necessary for completion of the vessel. Mr. Struben concludes his report by stating that the hull's realistic value was what it could have been sold for as scrap. In addition to the expert testimony, we received testimony from other witnesses in the instant case. Mr. Begley, a yacht broker, employed by Adventure, was authorized by petitioner to sell the hull at a commission of 10 percent. Mr. Begley testified that he presented the hull to several potential buyers and spent a considerable amount of time trying to obtain a buyer for the hull. One such individual was Mr. Hostrup, who represented a client interested in purchasing the hull. Mr. Hostrup testified that Mr. Begley suggested that Mr. Hostrup's client offer $ 50,000 for the hull. Mr. Hostrup testified that he recommended to his client that the hull not be purchased for $ 50,000 because he had concerns with respect to the condition of the welds on the hull. Mr. Hostrup's client offered $ 45,000 for the hull, which offer was rejected by petitioner. While in the process of trying to sell petitioners' hull, Adventure obtained two independent appraisals of the hull. Petitioners *510 paid for both appraisals. The first of these appraisals, performed by marine surveyor Mr. Swimm, indicates the fair market of the hull to be $ 28,744. The second appraisal, performed by marine surveyor Mr. Marks, indicates the fair market value to be between $ 30,000 and $ 35,000. In analyzing the testimony and expert reports from the expert witnesses, we find them to be lacking with respect to the value of the hull in 1985. In evaluating Captain Weber's expert report, we find it to be unhelpful. Captain Weber's expert report merely consists of a short statement of broad factors upon which he relied in making his original appraisal. The report is only 1-1/2 pages long and provides little guidance on the value of the hull. Captain Weber relied upon only the quality of workmanship, quality of materials, and costs in determining his appraisal, giving no discussion to marketability. We give Captain Weber's expert report no weight in determining the value of petitioners' hull in 1985. For the same reasons stated above, we find Mr. Sherbert's expert report is likewise unhelpful. Although Mr. Sherbert also analyzed the quality of workmanship and materials used in the construction *511 of the hull, he failed to give any conclusions as to the marketability of the hull in 1985. When asked how he would place a value on a boat, Mr. Sherbert testified that he would place a value on a boat based upon "whatever a person will pay for it." Mr. Sherbert's report, however, does not discuss whether such a person can be found in this market. Additionally, when asked about the market for hulls from 1979 to 1981, Mr. Sherbert stated that he was a designer and master builder, not a broker, and therefore he could not give a correct answer to that question. The value of any item cannot be determined in a vacuum; market conditions are a factor to be considered. Thus, we give Mr. Sherbert's expert report no weight in determining the value of petitioners' hull in 1985. Mr. Struben's expert report is helpful with respect to his discussion regarding the marketability of the hull; however, because he did not inspect the hull or its plans, his report is not persuasive as to a precise dollar value of the hull. Mr. Struben's report indicates that the market for large boats had been severely depressed in recent years including 1985. This statement appears to be accurate in light of *512 the fact that petitioners' hull had been on the market for 11 years without a sale. Mr. Sherbert may have been correct in his statement that the hull had a value greater than $ 145,000 in 1973; however, in 1985, when the market for that item was severely depressed, it is clear that its fair market value was negatively affected by such market conditions. Thus, even where, as in the instant case, the materials, labor, and design of a donated item are all of excellent quality, if there is no market or a severely depressed market for the item, then its value is affected. We find the fair market value of the hull in 1985 to be $ 45,000. We base this determination upon consideration of all the facts and circumstances in the instant case. We disagree with respondent's determination that the hull had either a zero value or salvage value. Additionally, we disagree with petitioners' argument that their success or lack thereof in finding a buyer for the hull is completely irrelevant in determining its fair market value. Although the hull was eventually sold by the church for its scrap value, we do not find this to be determinative either. Ordinarily, the price at which the property has *513 changed hands is persuasive evidence of fair market value, [2] but we do not find this to be determinative in the instant case because the church sold the hull for scrap 3 years after the donation date and under a compulsion to sell as petitioner informed them that the hull could no longer remain in the warehouse.
In 1985, however, there was a willing buyer for the hull. Mr. Hostrup, a marine consultant, surveyor, and estimator, represented a client interested in purchasing the hull in 1985, and recommended to his client that he make an offer of $ 45,000 for the hull. Mr. Hostrup made such a recommendation after physical inspection of the hull and with knowledge that the welds on the hull might have been defective. We find that Mr. Hostrup's client was a willing buyer with reasonable knowledge of the facts who made a bona fide offer of $ 45,000 for the hull, and we find this to be determinative *514 as to the value of petitioners' hull in 1985. We find that petitioners are not entitled to a charitable contribution deduction in 1985 in the amount of $ 145,000 as claimed on their return. We do find, however, that petitioners are entitled to a charitable contribution deduction under section 170 in the amount of $ 45,000 for 1985 with respect to the donation of a hull to the Unity Center of Christ. Issue 2: Rental Expenses
On their return for 1985, petitioners claimed deductions with respect to expenses incurred in connection with their North Carolina property. Respondent determined that the deductions were not allowable because the property was not held primarily for the production of income within the meaning of section 212. Section 212(2) allows individual taxpayers to deduct all ordinary and necessary expenses paid or incurred during the taxable year for the management, conservation, or maintenance of property held for the production of income. The standard for determining whether an individual is engaged in activities for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income so that *515 his or her expenses are deductible under section 212 is whether the individual engaged in the activity with the predominant purpose and intention of making a profit. Allen v. Commissioner, 72 T.C. 28, 33 (1979); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Section 183(a) provides the general rule that if an individual engages in an activity, and if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter with certain exceptions not here relevant. Although the taxpayer's expectation of profit need not be reasonable, it must nevertheless be a good-faith expectation. Sec. 1.183-2(a), Income Tax Regs. In determining whether the holding of property is the holding of property for the production of income within the meaning of section 212(2), the intention of the taxpayers is of paramount importance. Johnson v. Commissioner, 59 T.C. 791, 814 (1973), affd. 495 F.2d 1079 (6th Cir. 1974). If the predominant purpose and use of the property *516 was for recreation, a hobby, or some other nonprofit motive, rather than to derive income, they are not entitled to the deductions claimed. Id.
Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors, derived principally from case law, which are to be considered in determining whether an activity is engaged in for profit including: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. The issue is one of fact to be resolved not on the basis of any one factor but on the basis of all the surrounding facts and circumstances. Allen v. Commissioner, supra at 34. The burden of proving *517 the requisite intention is on petitioners. Rule 142(a). In 1981, petitioners purchased a parcel of unimproved real property on Ski Mountain, Bowling Rock, North Carolina, upon which they built a home completed in November 1984. Petitioner testified that his intent with respect to this property was to use it as rental property for a period of years until he retired and eventually would use it as his primary residence. From January to June 1985, the property was closed, and on July 10, 1985, petitioner was notified by a neighbor's cleaning woman that it had suffered extensive water damage. On July 17, 1985, Mrs. Bragg went to North Carolina to oversee repairs to the property; she remained until the latter part of August. Petitioner testified that he did not rent the North Carolina property in 1986 or years thereafter and took no deductions with respect to the property except for interest and property taxes. One factor that we will consider in the instant case is the manner in which petitioners carried on the activity. The North Carolina home was built in a ski resort area; however, petitioner testified that he did not want to rent to skiers. Petitioners did not advertise the *518 property for rent or take advantage of the community's offer to find tenants. In fact, petitioners did not rent the property in 1985 and allegedly attempted to rent the property to only one person, Mr. Rickard. In addition, petitioner testified that the North Carolina home was lavishly furnished with all leather furniture and rugs purchased in China. Although the surroundings in the home undoubtedly would make the property attractive to potential renters, the extent and character of the furnishings are indicative of an intention to satisfy petitioners' personal tastes and comfort rather than of an intent to make a profit. Thus, we find that the manner in which petitioners carried on this activity suggests that they did not have the intent to use the property for rental purposes. Another factor we will consider is the time and effort petitioners expended with respect to this activity. Petitioners allegedly sought only one renter, did not advertise, and did not want to rent their property located on Ski Mountain to skiers. These facts would suggest that petitioners expended little or no time or effort in trying to rent the property. A third factor to be considered is the amount *519 of any profits realized from the activity. The only profits claimed was the $ 2,000 income petitioners alleged to have received from Mr. Rickard for rental during the month of December 1984. Neither petitioners nor Mr. Rickard, however, produced any documentary evidence contemporaneous with the alleged rental indicating that this payment was in fact made. Charles Bragg, petitioners' son, testified that the entire family went to the North Carolina property for 2 weeks in December 1984 to escape the media coverage of his criminal trial and Mr. Rickard had been invited to join them. It is difficult for the Court to believe that petitioners charged Mrs. Bragg's sister and her sister's husband rent on this occasion. In considering all the facts and circumstances, we hold that petitioners failed to meet their burden of proof on this issue. Thus, we find that the North Carolina property was not acquired or held by petitioners during taxable year 1985 primarily for the purpose of making a profit, and accordingly, they are not entitled to deductions with respect to the North Carolina property in excess of those allowed by respondent. Issue 3: Entitlement to a Bad Debt Deduction
*520 Petitioners contend that they are entitled to bad debt deductions in the amounts of $ 40,769 and $ 36,627 representing payments made on behalf of their son Charles Bragg in 1985. At trial, petitioners claimed that other payments made to or on behalf of Charles Bragg for legal expenses were bad debts in 1985. Respondent disallowed the deductions of $ 40,769 and $ 36,627 on the grounds that claimed losses for payment in discharge of an agreement to act as a guarantor, endorser, or indemnitor of an obligation are subject to the rules under section 1.166-9, Income Tax Regs., which petitioners fail to meet. Furthermore, respondent contends that other payments made to or on behalf of Charles Bragg for his legal expenses do not qualify as bona fide debts. Sec. 1.166-9, Income Tax Regs.
Respondent correctly asserts that claimed losses for payment in discharge of an agreement to act as a guarantor, endorser, or indemnitor of an obligation are subject to the special rules of section 1.166-9(e)(1), Income Tax Regs.Section 1.166-9(e)(1), Income Tax Regs., provides the following: Treatment as a worthless debt of a payment made by a taxpayer in discharge of part or all of the taxpayer's *521 agreement to act as a guarantor, endorser, or indemnitor of an obligation is allowed only if the taxpayer demonstrates that reasonable consideration was received for entering into the agreement. * * * consideration received from a taxpayer's spouse or any individual listed in section 152(a) must be direct consideration in the form of cash or property.
A son of the taxpayer is an individual listed in section 152(a)(1). Section 1.166-9(e)(1), Income Tax Regs., disallows any deduction for a worthless debt by a guarantor where the underlying debtor is the guarantor's child unless the guarantor has received direct consideration in the form of cash or property in exchange for entering into the guarantee agreement. Lair v. Commissioner, 95 T.C. 484, 491 (1990). Petitioner was liable as a cosigner on the two mortgages owed by his son to Atlantic Bank. There is no evidence that Charles Bragg furnished any direct consideration for petitioner's agreement to cosign on these loans as required under section 1.166-9(e)(1), Income Tax Regs. Accordingly, petitioners are not entitled to a deduction for so-called bad debts on account of payments made to Atlantic *522 Bank. Bona Fide Debts
Section 166(a) provides that a deduction shall be allowed for any bad debt that becomes worthless within the taxable year. Section 166 makes a distinction between business bad debts and nonbusiness bad debts. Sec. 166(d); sec. 1.166-5(b), Income Tax Regs. Section 166(d)(2) excludes from the application of section 166(a) any nonbusiness debt, which is defined by negative implication as a debt other than (1) a debt created or acquired in connection with a taxpayer's trade or business, or (2) a debt whose loss was incurred in the taxpayer's trade or business. A nonbusiness bad debt is treated as a loss resulting from the sale or exchange of a short-term capital asset. Sec. 166(d). Petitioners bear the burden of proving that (1) bona fide debts existed between petitioners and Charles Bragg, and (2) the debts became worthless in 1985. Rule 142(a); Crown v. Commissioner, 77 T.C. 582, 598 (1981). A bona fide debt is one that arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Sec. 1.166.1-(c), Income Tax Regs. Gifts and contributions to capital *523 are not considered to be debts for purposes of section 166. Sec. 1.166-1(c), Income Tax Regs. In determining whether a debtor-creditor relationship represented by a bona fide debt exists, this Court considers the facts and circumstances of the case at issue and examines, on a case-by-case basis, the substantive nature of the relationship. Fisher v. Commissioner, 54 T.C. 905, 909 (1970). The test in making such a determination is whether the debtor is under an unconditional obligation to repay the creditor and whether the creditor intends to enforce repayment of the obligation. Id. at 909-910; sec. 1.166-1(c), Income Tax Regs.
In making the determination of whether in substance a bona fide debt was created, we will not ignore the objective indicia of a bona fide debt, and in so doing, we will consider the following factors: (1) Whether a note or other evidence of indebtedness exists and whether interest is charged, Clark v. Commissioner, 18 T.C. 780, 783 (1952), affd. 205 F.2d 353 (2d Cir. 1953); (2) whether any security or collateral is requested, Zimmerman v. United States, 318 F.2d 611, 613 (9th Cir. 1963); *524 (3) whether a demand for repayment has been made, Montgomery v. United States, 87 Ct. Cl. 218, 23 F. Supp. 130 (1938); (4) whether the party's records, if any, reflect the transaction as a loan, Road Matls., Inc. v. Commissioner, 407 F.2d 1121 (4th Cir. 1969), affg. in part, vacating in part and remanding T.C. Memo 1967-187; and (5) whether any repayments have been made, Estate of Ames v. Commissioner, a Memorandum Opinion of the Court dated Feb. 7, 1946. Intrafamily Loans
Intrafamily transactions are subject to close scrutiny. Caligiuri v. Commissioner, 549 F.2d 1155, 1157 (8th Cir. 1977), affg. T.C. Memo. 1975-319; Perry v. Commissioner, 92 T.C. 470, 481 (1989), affd. without published opinion 912 F.2d 1466 (5th Cir. 1990). The presumption is that a transfer between family members is a gift. Perry v. Commissioner, supra at 481; Estate of Reynolds v. Commissioner, 55 T.C. 172, 201 (1970). *525 This presumption may be rebutted by an affirmative showing that there existed a real expectation of repayment and intent to enforce the collection of the indebtedness. Estate of Van Anda v. Commissioner, 12 T.C. 1158, 1162 (1949), affd. per curiam 192 F.2d. 391 (2d Cir. 1951). In the context of intrafamily loans, we will also give considerable weight to the intent of the parties. Hunt v. Commissioner, T.C. Memo. 1989-335. To prevail, petitioners must show that the alleged loans made to Charles Bragg for his legal expenses were made with a reasonable expectation, belief, and intention that the advances would be repaid. Zimmerman v. United States, supra. This determination depends upon all the facts and circumstances and generally no one fact is determinative. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). In the instant case, neither petitioners nor Charles Bragg executed any notes for advances to Charles Bragg, nor was there any evidence indicating that interest was charged. There is no evidence in the record indicating *526 that petitioners were in any way liable to Charles Bragg's attorneys for payment of Charles' legal expenses. Petitioners produced no evidence of any repayments made by Charles Bragg or that petitioners made a demand of Charles Bragg for repayment. Petitioners rely on a Memorandum Opinion of this Court, Hunt v. Commissioner, supra, contending that the facts in the Hunt case are very similar to the facts in the instant case. We do not find that to be accurate. The taxpayers in Hunt loaned their children substantial funds to enable them to make margin calls in the silver and gold commodities markets. In Hunt, unlike the instant case, many indicia of a debtor-creditor relationship existed between the taxpayers and their children to whom they made loans. First, in Hunt, notes were executed and interest accrued on those notes. Second, a demand for repayment was made although the taxpayers knew that the amounts could not be repaid. Thirdly, both the taxpayers and their children in Hunt treated the transactions as loans on their books and records. Finally, in Hunt, repayments were made by two of the taxpayers' children and *527 one child repaid in full the sums she borrowed. Thus, we find petitioners' reliance on Hunt to be misplaced. In consideration of all the facts and circumstances, we find that petitioners have failed to meet their burden of proving that any of the advances to petitioners' son or on behalf of their son for legal expenses were bona fide debts which arose from a debtor-creditor relationship. Additionally, petitioners failed to successfully rebut that there existed a real expectation of repayment and intent to enforce the collection of any indebtedness. Thus, we find that petitioners have failed to overcome the presumption that the advances to or on behalf of their son, Charles Bragg, were gifts or advances for which they had no reasonable expectation of being repaid. Accordingly, petitioners are not entitled to any deductions with respect to advances made to or on behalf of their son Charles Bragg for taxable year 1985. Respondent's determination is sustained on this issue. Issue 4. Section 6653(b) Civil Fraud Addition
Respondent argues that petitioners' pattern of conduct with respect to taxable year 1985 is fraudulent. Respondent bears the burden of proving fraud *528 under section 6653(b) by clear and convincing evidence. Sec. 7454(a); Rule 142(a); Castillo v. Commissioner, 84 T.C. 405 (1985). Respondent must show that petitioners intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of those taxes, that there is an underpayment of tax, and that some portion of the underpayment for each taxable year was due to the petitioners' fraudulent intent. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366, 377-378 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved upon review of the entire record. Rowlee v. Commissioner, supra at 1123; Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). While fraud will never be presumed, Beaver v. Commissioner, 55 T.C. 85, 92 (1970), *529 it may be proved by circumstantial evidence, e.g., Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). In Meier v. Commissioner, 91 T.C. 273 (1988), this Court identified a nonexclusive list of indicia or badges of fraud which respondent argues are present in the instant case including (1) the understatement of income, (2) implausible or inconsistent explanations of behavior, (3) use of altered documents to retroactively reflect transactions in the light the taxpayer wanted them to appear, and (4) use of records to conceal the true nature of a transaction. An additional badge of fraud, which respondent asserts is present in the instant case, is the past finding of fraud against petitioners by this Court involving taxable years 1980 and 1981. [3]
*530 At the outset, we recognize that arguably the instant case borders on a finding of the fraud addition to tax; however, after a careful balancing of the facts and circumstances and for the reasons stated below, we find that respondent has failed to meet the burden of proof on this issue. First, respondent argues that petitioners were aware that the hull's only value was either zero or its scrap value, and petitioners intentionally overstated its value for purposes of obtaining a larger charitable contribution deduction for 1985. We disagree. Although, as we have found above, Captain Weber's methods for determining the fair market value of the hull in his appraisal were incomplete in that he focused only upon the quality of materials and workmanship used and not upon the market for the donated property as it existed in 1985, this does not lead to the conclusion that petitioners intentionally used this appraisal in order to fraudulently overstate the value of the hull on their return. Second, respondent argues that petitioners have inconsistent or implausible explanations for their behavior. In support of this contention, respondent points to petitioners' treatment of their so-called *531 bad debt deduction for 1985. Petitioners' 1985 tax return claimed a short-term capital loss in a manner that did not indicate that it represented a bad debt. When describing the short-term loss, petitioners used the terms "Atlantic Bank" instead of "Bad Debt". The dates shown on the return for the acquisition and sale of property at a short-term loss were numbers picked out of the air with no relation to reality as admitted by petitioners' accountant. Furthermore, petitioners claimed a bad debt deduction in 1984 for a loan to a family member, which deduction was disallowed by respondent, and petitioners described that loan as a bad debt on their 1984 return. Respondent argues that petitioners intentionally described their so-called bad debt deduction for 1985 as "Atlantic Bank" in order to conceal its true nature because the same type of deduction had already been disallowed for the previous year. It is undisputed that petitioners' description of their claimed loss in 1985 is misleading. It is not clear, however, that petitioners described it as such with fraudulent intent. Although petitioners may have been negligent in signing their return which included this error, we find *532 that respondent has not proven by clear and convincing evidence that they did so with fraudulent intent. Respondent further argues that petitioners used an altered document to retroactively reflect a transaction in the light in which they wanted it to appear. Specifically, respondent contends that petitioner altered the December 5, 1985, agreement between petitioners and the Unity Center of Christ by crossing out the language that made reference to the donation of the warehouse and then proceeded to claim at the audit level that the initialing by all parties of this modification took place in December 1985 when in fact Reverend Byrns did not initial the modified document until May 1987. Respondent argues that this is evidence that petitioners were attempting to conceal the true nature of the transaction. The testimony from the tax auditor, however, reveals that she was given an affidavit by petitioner which stated that he modified, signed, and initialed the document in December 1985. The auditor further testified that she did not recall asking petitioner when Reverend Byrns initialed the change. Additionally, respondent argues that this Court's past finding of fraud against *533 petitioners for taxable years 1980 and 1981 is further evidence of their fraudulent intent in the instant case. Although a finding of fraud for previous taxable years can be used as circumstantial evidence of fraudulent intent for the year or years at issue, [4] we do not find this argument to be persuasive in the instant case. After a full and thoughtful consideration of the facts in this case, we find that respondent has failed to meet the burden of proving by clear and convincing evidence that any part of petitioners' deficiency with respect to taxable year 1985 was due to fraud, and in the instant case, find that other additions to tax are more appropriate. Accordingly, petitioners are not liable for the addition to tax for fraud under section 6653(b) for taxable year 1985. Issue 5. Section 6659 Valuation Overstatement Addition
Respondent *534 determined by notice of deficiency that petitioners' underpayment in 1985 is, in part, attributable to the charitable contribution deduction due to a valuation overstatement. Section 6659 provides, inter alia, for an addition to tax on underpayments of $ 1,000 or more which are attributable to valuation overstatements. A valuation overstatement is defined to include a claim on a return of a valuation of 150 percent or more of the correct valuation. Sec. 6659(c). The amount of the addition to tax equals the product of the applicable percentage, as determined under section 6659(b), and the underpayment of tax resulting from the overvaluation. Sec. 6659(a). We have held above that petitioners' donation of the hull to the Unity Center of Christ had a value of $ 45,000. The value claimed on petitioners' return for taxable year 1985 exceeds the correct value determined by this Court by more than 150 percent, and the underpayment resulting from the valuation overstatement exceeds $ 1,000; thus, we sustain respondent's determination of the addition to tax for a valuation overstatement under section 6659. Issue 6. Section 6661 Substantial Understatement
Respondent determined *535 by notice of deficiency that petitioners are liable for the addition to tax for a substantial understatement under section 6661. The amount of the section 6661 addition to tax for additions assessed after October 21, 1986, is equal to 25 percent of the amount of any underpayment attributable to the substantial understatement. Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002, 100 Stat. 1951; Pallottini v. Commissioner, 90 T.C. 498, 501-503 (1988). A "substantial understatement" occurs when an "understatement" exceeds the greater of $ 5,000 or 10 percent of the amount of tax required to be shown on a return. Sec. 6661(b)(1)(A). An "understatement" means the excess of the amount of the tax required to be shown on a return over the amount of tax imposed which is shown on the return (reduced by any rebates within the meaning of section 6211(b)(2)). Sec. 6661(b)(2)(A). Section 6661(b)(3) provides that, for purposes of determining the amount of the addition to tax assessed under section 6661(a), the portion of the substantial understatement on which a penalty is imposed under section 6659 shall not be taken into account. Thus, in *536 determining whether section 6661 applies in the instant case, we will not take into consideration any part of the understatement attributable to petitioners' charitable contribution deduction. In the instant case, we have determined that petitioners have understated their income tax liabilities in the year at issue. Petitioners argue, however, that they are not liable for the section 6661 addition to tax because their understatements should be reduced under section 6661(b)(2)(B) for purposes of applying the section 6661 addition to tax. Section 6661(b)(2)(B) provides for the reduction of an understatement by that portion of the understatement which is attributable to either: (1) The tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment; or (2) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. The Secretary may waive all or part of the section 6661 addition to tax upon a showing by the taxpayer that there was reasonable cause for the understatement and that the taxpayer acted in good faith. Sec. 6661(c). This Court *537 may review the Secretary's decision for an abuse of discretion. Mailman v. Commissioner, 91 T.C. 1079, 1083-1084 (1988). Our review of the Commissioner's decision not to waive this addition to tax is limited to whether the Commissioner's discretion has been exercised arbitrarily, capriciously, or without sound basis in fact. Id. at 1084; Smith v. Commissioner, 91 T.C. 733 (1988), affd. sub nom. Karr v. Commissioner, 924 F.2d 1018, 1026 (11th Cir. 1991). Petitioners have the burden of persuading us that, in refusing to waive the addition to tax, respondent has exercised this discretion "arbitrarily, capriciously, or without sound basis in fact." Mailman v. Commissioner, supra at 1084. Petitioners contend that respondent abused this discretion in the instant case by not waiving the section 6661 addition to tax because they reasonably relied in good faith upon their C.P.A. with respect to deductions claimed on the 1985 return. In determining whether petitioners had reasonable cause and acted in good faith, we look primarily *538 to the extent of their efforts to assess their proper tax liability under law. Id.; sec. 1.6661-6(b), Income Tax Regs. Reliance on professional advice would constitute a showing of reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Sec. 1.6661-6(b), Income Tax Regs.
Based upon all the facts and circumstances, we find that petitioners' alleged reliance upon their C.P.A. was not reasonable. First, petitioners took deductions for rental expenses on their vacation home in North Carolina although, as we found above, they were not able to prove that they held the property for rental purposes. Moreover, in light of the fact that petitioners did not rent the North Carolina property in 1985 or any other year, we find that any reliance by petitioners on their C.P.A. with respect to the rental loss was not reasonable. Second, petitioners took a short-term capital loss deduction for a claimed bad debt resulting from an alleged loan to a family member describing it on their return in a way which was misleading. The short-term capital loss was described as "Atlantic Bank" instead of "Bad Debt". On petitioners' *539 return for 1984, they also claimed a bad debt deduction resulting from an alleged loan to a family member which they described using the term "Bad Debt" and which was disallowed by respondent. Petitioners reviewed their 1985 return with their C.P.A. and failed to bring to his attention the inaccuracy of the description of their so-called bad debt even after they were aware of the problems with this same type of deduction on their 1984 return. Thus, we find that petitioners' reliance on their adviser was likewise not reasonable with respect to the so-called bad debt deduction, and, furthermore, we find that petitioners' description of the so-called bad debt on their 1985 return failed to adequately disclose relevant facts affecting the item's tax treatment as required in section 6661(b)(2)(B). Accordingly, if after making the Rule 155 computations, there exists a substantial understatement, apart from the valuation overstatement, to which section 6661 attaches, we hold that petitioners are liable for the addition to tax under section 6661. Issue 7. Section 6621(c) Increased Interest
Respondent determined by notice of deficiency that petitioners' underpayment attributable *540 to the charitable contribution deduction is subject to interest at the rate determined under section 6621(c) (formerly section 6621(d)). Section 6621(c) provides for an increase in the annual rate of interest to 120 percent of the statutory rate under section 6601 on underpayments of tax where there is an underpayment of taxes in excess of $ 1,000 attributable to one or more enumerated tax-motivated transactions in any year. Tax-motivated transactions include, inter alia, valuation overstatements within the meaning of section 6659(c). Sec. 6621(d)(3)(A)(i). We have held above that the underpayment on petitioners' 1985 return was due in part to a valuation overstatement as defined by section 6659(c) and that the underpayment on petitioners' return attributable to such valuation overstatement exceeded $ 1,000. We therefore hold that the increased rate of interest determined under section 6621(c) applies to the underpayment caused by such valuation overstatement as determined by respondent. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. See Grill v. United States, 157 Ct. Cl. 804, 303 F.2d 922, 927↩ (1962).
3. See Bragg v. Commissioner, 856 F.2d 163 (11th Cir. 1988), affg. T.C. Memo. 1986-562↩.
4. See Padow v. Commissioner, 843 F.2d 1388 (4th Cir. 1988), affg. without published opinion T.C. Memo. 1987-250↩.